# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 23, 2014

## STATE OF TENNESSEE v. REGINALD DEWAYNE TUMLIN

**Appeal from the Criminal Court for Hamilton County**
**No. 276560     Rebecca J. Stern, Judge**

---

**No. E2013-01452-CCA-R3-CD - Filed December 15, 2014**

---

A Hamilton County jury convicted the Defendant, Reginald Dewayne Tumlin, of two counts of child abuse, one count of criminally negligent homicide, and one count of aggravated child neglect. The trial court imposed an effective sentence of sixty years in the Tennessee Department of Correction. The Defendant asserts that: (1) the trial court erred when it failed to compel the State to make an election of offenses; (2) the trial court failed to instruct the jury that reckless endangerment and attempted aggravated child neglect are lesser-included offenses of aggravated child neglect; (3) the evidence is insufficient to sustain his convictions; (4) the trial court improperly admitted medical testimony about the victim's injuries; (5) the State engaged in prosecutorial misconduct; (6) the trial court improperly instructed the jury on flight; and (7) the cumulative effect of these errors deprived the Defendant of a fair trial. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., and JOE H. WALKER, III, SP. J., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Reginald Dewayne Tumlin.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; William H. Cox, III, District Attorney General; Charles D. Minor and Kristen D. Spires, Assistant District Attorneys General for the appellee, State of Tennessee.

## OPINION
### I. Background and Facts

This case arises out of the death of the Defendant's three-year-old son, the victim. After a police investigation into the death, a Hamilton County grand jury indicted the Defendant for felony murder during the perpetration of aggravated child abuse, aggravated child abuse, felony murder during the perpetration of aggravated child neglect, and aggravated child neglect. These charges were tried by a jury in June 2012.

Jamie Boles, a registered nurse, testified that she treated the victim when he arrived at the emergency room of Erlanger Children's Hospital on May 1, 2010. She said that a woman, who was "upset," brought the victim to the emergency room. The victim was pale, not breathing, and Ms. Boles could see bruising on him. She said that her first impression upon seeing the victim was that he was dead. The woman who brought the child to the hospital told Ms. Boles that, when she had arrived home from work, she began playing with the victim when he began "acting funny" and started "breathing funny," so she brought him to the hospital. Ms. Boles stated that she immediately took the victim to a trauma room and checked for a pulse. Finding none, she began chest compressions. Ms. Boles identified and the trial court admitted into evidence the victim's emergency room records. Ms. Boles stated that, according to the emergency room records, the victim arrived at 3:19 a.m. and was pronounced dead at 3:34 a.m.

Ms. Boles described her observations of the victim's injuries:

> There was [sic] multiple bruisings and abrasions on his arms and behind his ears, on his face, on his legs. There was [sic] bite marks. There was bruising on his legs. And a place on one of his legs from where it looked like a scar, like a healing burn or something along those lines. So he had multiple abrasions and bruising and the bruises were all in different stages of healing.

She stated that her observation of the injuries was consistent with ongoing abuse and not a "one night instance."

Kristen Goodin, a registered nurse, testified that she was in the trauma room of the emergency room when Ms. Boles ran in "with this lifeless little boy in her arms." Once the victim was placed on the stretcher, Ms. Goodin observed "extensive bruising," bite marks on the victim's arms, "fingernail marks" on the victim's ears, and burn marks on the back of the victim's leg. Ms. Goodin stated that her role in the trauma room that night was to serve as the recorder and keep a record of the procedures administered. She described the treatment to the victim as follows:

> When he was initially placed we hook[ed] him up to our monitors,

which show if there's any heart rate or breathing or anything going on. And there wasn't. So immediately we go to the procedures of starting a code and doing CPR on him. We start[ed] the compressions. And we went through - - we bagged him, which means we have the ambu bag out [ ] trying to breath[e] for him. And [respiratory] therapists came in an[d] intubated him, and we continued with the compressions and we started administering epinephrine, which we did two rounds, which is one of the drugs we use in codes.

Ms. Goodin testified that, based upon her experience, the injuries she observed on the victim were consistent with inflicted injuries.

Sam Crites, II, a registered respiratory therapist, testified that on May 1, 2010, he was paged to the emergency department trauma room at Children's Hospital of Erlanger. He initiated pediatric advanced life support on the victim in an attempt to resuscitate him. As he prepared the victim for placement of an endotracheal tube, he observed that the victim had "a slightly blue hue to him," and Mr. Crites did not see any spontaneous respirations. Mr. Crites stated that the victim's pH was less than 6.5 and for normal functioning the pH needs to stay within 7.35 and 7.45.

Dale Dubois testified as an expert in the field of pediatric medicine and was the treating physician at the Erlanger emergency room on May 1, 2010. In preparation for his testimony at trial, Dr. Dubois reviewed the emergency department records, photographs, and the coroner's report. He recalled that the victim was brought to the emergency room early in the morning. When the victim arrived, he was not breathing, he did not have a heart rate, and he did not have a pulse. Dr. Dubois said that the victim was immediately taken to a trauma room where a device helped put air into his lungs, chest compressions were started, an IV was placed, and the victim was administered two rounds of medicine to restart his heart. He said that, with all of this intervention, the victim never started breathing on his own, never regained a heart rate, and never had a pulse. Medical personnel declared the victim "dead on arrival."

Dr. Dubois testified that the victim had considerable bruising "covering" his extremities, upper body, face, and ears. Dr. Dubois described the bruising as in "multiple stages," meaning that the injuries were incurred at different times. There was a second-degree burn mark on the back of the victim's leg. Dr. Dubois also noted that the victim's pupils were "fixed and dilated," indicating that the victim had been dead for "some time." Dr. Dubois said that the victim's pupils indicated that he had not had oxygen to his brain for "approximately an hour or so." Dr. Dubois opined that the victim's injuries were not consistent with a fall or injuries inflicted by another three or four-year-old child. He explained that the width of the bite mark on the victim's shoulder, which he described as

"very deep" with broken skin, was three inches wide and thus inconsistent with the mouth of a child.

Dr. Dubois testified regarding the victim's ruptured bowel. He stated that symptoms associated with a ruptured bowel would be significant pain, fever, and vomiting. Dr. Dubois said that it was possible for a child to survive a ruptured bowel if treated immediately.

On cross-examination, Dr. Dubois testified that he had "seen" children with ruptured bowels that did "just fine" following a surgery; however, Dr. Dubois stated that he could not predict the outcome in this case because the victim had "so many significant injuries above and beyond" the ruptured bowel. He noted the severity of the injuries to the victim's bowels, stating that the victim's bowel was "degloved and torn off and ruptured in several places," making it difficult to speculate about the success of a surgery. He agreed that the victim's other injuries did not cause his death but maintained that the other injuries were "significant."

James Metcalfe, the Chief Medical Examiner for the Hamilton County Medical Examiner's office, testified as an expert witness in the field of forensic pathology. Dr. Metcalfe stated that he performed the autopsy on the victim. Dr. Metcalfe identified the order for autopsy and a summary portion on the order form that helped prepare him for the autopsy. From the summary, Dr. Metcalfe learned that Shameka Greer drove the victim to the hospital and that the victim was dead on arrival. Ms. Greer advised medical personnel at the hospital that the victim had complained of stomach pains and was gasping for air. After examining the victim, Dr. Metcalfe determined that the manner of death was homicide and the cause of death was bowel perforations due to blunt force abdominal trauma. He described blunt force trauma as "a very substantial blow" and not the type of injury a child might sustain during "normal child play." Dr. Metcalfe stated that the pattern of injury was consistent with inflicted multiple blunt trauma.

Dr. Metcalfe testified that he found blunt force injury to the victim's abdomen and a rupture of the small intestine. Dr. Metcalfe estimated that the holes in the small intestine had been present for eight to twelve hours before the victim's death. Other injuries in the abdominal cavity may have been present for four or five days. He found bruising on the small intestine, the victim's head, neck, trunk, and all four extremities. Dr. Metcalfe observed marks that resembled bite marks, abrasions, and areas with third-degree burn marks consistent with a burn caused by a cigarette. Dr. Metcalfe found bruising under the victim's scalp, subdural bleeding underneath the thick covering of the brain and a subarachnoid hemorrhage, described as bleeding under the thin covering of the brain. Dr. Metcalfe stated that both of these types of bleeds are caused by blunt force injury. Dr. Metcalfe stated that the injuries to the victim's abdomen would have caused "severe pain and rigidity of the abdominal wall" requiring immediate medical attention. Dr. Metcalfe said that he observed

-4-

injuries in various stages of healing and, thus, some of the injuries were "old" and some of the injuries were "new."

Dr. Metcalfe testified that there was a "great deal of injury" to the back of the victim's body. He said that he considered the presence of "multiple separate injuries" in determining that the manner of death was homicide. He described the victim's injuries as "a hail storm [ ] of injury, like raining blows." He also considered the severity of the abdominal injury. He stated that there was "major injury through to the soft part of the abdomen," which is partly protected by the rib cage. Dr. Metcalfe stated that the nature of these injuries were not consistent with an accidental cause.

On cross examination, Dr. Metcalfe agreed that he reviewed x-rays taken of the victim at the hospital, and there was no indication of fractures to the skeletal system.

Latise Ramsey, the victim's aunt, testified that the victim and his mother lived with her and her two children, ages four and eight. Ms. Ramsey stated that the victim went to the pediatrician on a regular basis for well-child checkups. She stated that she went with the victim and his mother to these appointments and that the victim did not have any ongoing health problems.

Ms. Ramsey testified that the victim would stay with the Defendant for two days "maybe once every two months." She recalled that in April 2010, she took the victim to the store with her. As she went in the store, the Defendant approached her and asked if the victim was with her. She indicated that the victim and her cousin were in the car. Ms. Ramsey went in the store and purchased her items. When she returned to the car, the Defendant asked her to call the victim's mother and ask if the victim could stay with him for Easter because he had "an outfit" for the victim and wanted to take the victim to see the Defendant's mother. Ms. Ramsey contacted her sister, the victim's mother, and received permission for the victim to go with the Defendant. Ms. Ramsey stated that the Defendant did not have any injuries on him at this time.

Ms. Ramsey testified that the victim's mother and the Defendant agreed that the victim should continue to stay with the Defendant so that the Defendant could potty train the victim. Ms. Ramsey explained that they had had difficulty potty training the victim and that the victim's mother believed the Defendant might be better to train the victim since he was a man. Ms. Ramsey said that the victim's mother contacted the Defendant frequently and that the Defendant would tell her "let [the victim] stay a little while longer, I almost got him potty trained."

James Tate, a Chattanooga Police Department detective, responded to Erlanger

hospital in the early morning hours of May 1, 2010, on a call related to a deceased child. Detective Tate first spoke with Dr. Dubois, the treating physician, and then to the person who brought the victim to the hospital, Shameka Greer, the Defendant's girlfriend. Detective Tate had Ms. Greer transported to the police services center where a recorded interview was conducted. Detective Tate also spoke with the Defendant's sister, Colandra Tumlin, who gave a statement that was inconsistent with Ms. Greer's statement.

Detective Tate testified that the Defendant was not present at the hospital and that he was unable to locate the Defendant that night. Detective Tate stated that he was unable to make contact with the Defendant until May 18, 2010, after seeking assistance from the fugitive unit. When the Defendant was brought into the police service center, he had a hat and wig with him. Detective Tate stated that he reviewed the Defendant's rights with him and that the Defendant signed a rights waiver. The Defendant told police that the victim had been in his custody since April 4, 2010. He explained that the victim's mother had experienced difficulty potty training the victim, so she had allowed the victim to stay with the Defendant in order for the Defendant to potty train the victim. The Defendant stated that the only persons caring for the victim during this time were he, Ms. Greer, and "on an occasion or two" "a grandmother."

Detective Tate testified that the Defendant said that on April 30, 2010, Ms. Greer left for work shortly before 6:00 p.m. while he and the victim remained at home. One of the Defendant's friends, Cornel Watkins, came over, and the two men watched basketball for thirty to sixty minutes. After Mr. Watkins left, the Defendant "play[ed]" with the victim. He described this "play" as wrestling that including biting. He stated that he "bites everyone." He also told the police that he hit the victim and demonstrated the action. In describing the Defendant's demonstration, Detective Tate stated, "He made his right hand into a fist and swung it backwards like a backhand." At some point, the victim "had an accident in his pants," and the Defendant bathed and changed the victim. The Defendant recalled that Ms. Greer arrived home around 1:00 a.m. after he had finished bathing the victim and was dressing him. Detective Tate said that he confirmed with Ms. Greer's employer that she left work after 12:30 a.m. The Defendant did not "say much" about what occurred after Ms. Greer arrived home, however, he told Defendant Tate that he did not go to the hospital with the victim because he was afraid of "the hospital police" seeing the victim's injuries.

Detective Tate identified photographs of the victim's injuries and confirmed that the photographs fairly depicted the injuries he observed on the victim at the hospital and on May 3, 2010, at the Medical Examiner's office.

On cross-examination, Detective Tate agreed that the Defendant's three other

children, two of whom were four years old and the other three years old, were at the Defendant's house on Wednesday or Thursday before the victim died.

On redirect examination, Detective Tate confirmed that from May 1, 2010, until May 18, 2010, both he and the fugitive unit were "actively looking" for the Defendant. He stated that the Defendant did not offer an explanation for the victim's injuries other than "he bites people and he would playful hit his son [while] wrestling and playing."

Bill Phillips, a Chattanooga Police Department sergeant, testified that, on May 1, 2010, Detective Tate notified him of the victim's death. He stated that the victim had been transported to the hospital in a private vehicle and thereafter the hospital notified the police department of a deceased child. Sergeant Phillips was not present during Ms. Greer's interview, but he approached her for consent to search the vehicle she drove to the hospital. Ms. Greer would not provide the name of the owner of the vehicle, but the police later determined the car was owned by Colandra Tumlin, the Defendant's sister. Sergeant Phillips stated that, after police officers had been unsuccessful in locating the Defendant for questioning about the victim's death, he approached the police department's fugitive unit seeking assistance in locating the Defendant. Both the fugitive unit and the U.S. Marshals assisted in locating the Defendant on May 18, 2010. The Defendant was found with a wig. The Defendant stated that he knew that the police were looking for him, and he used the wig to disguise himself.

Sergeant Phillips testified about the police interview of the Defendant on May 18, 2010. He recounted that the Defendant's statement about the events leading up to the victim's death was consistent with Detective Tate's testimony. Additionally, he stated that the Defendant told the police during the interview that he had asked the victim's mother to come and get the victim on April 30, 2010, but that she had not done so. The Defendant told the police that he realized something was wrong with the victim when he heard the victim making noises. He said that he called the victim to him and asked the victim what was wrong. The victim pointed to his stomach and said, "it hurts." The Defendant gave the victim water, and the victim began "acting as though he was choking," so the Defendant stopped giving him water.

Greg Mardis, a Chattanooga Police Department crime scene investigator, testified that he reported to the hospital on May 1, 2010, where he viewed the victim's body. He described visible injuries to the victim that included cuts, scratches, bites, and burn marks. After taking photographs and collecting the victim's clothing from medical personnel, Detective Mardis went to the Defendant's residence. Here, Detective Mardis did a "walkthrough of the scene" and then took photographs and video recordings of the premises. He identified the photographs of rooms inside the Defendant's residence. Detective Mardis stated that he

collected two space heaters from the residence because Ms. Greer had told hospital personnel that a space heater had been the source of the burn on the victim's leg. He also collected an iron from a night stand in "the adult's bedroom." After taking photographs of the vehicle driven to the hospital by Ms. Greer, Detective Mardis went to the Medical Examiner's office to swab the bite marks on the victim's shoulders and arms and take more photographs.

Tim Pickard, a Chattanooga Police Department officer, testified that he worked in the fugitive unit and located the Defendant. Initially, he spoke with the victim's mother, the Defendant's girlfriend, and the mothers of the Defendant's other children. He also spoke with the Defendant's family members and two close friends in an attempt to learn the Defendant's location, but none of these persons knew the Defendant's whereabouts. Several days after trying to locate the Defendant, the fugitive unit employed the help of the U.S. Marshals. The Defendant was ultimately located on May 18, 2010, in an apartment on Sequoyah Drive. Officer Pickard explained that the fugitive unit received information that the Defendant was staying at this location and set up surveillance of the apartment for "a couple of hours" on May 17, 2010.

Officer Pickard testified that at 6:00 a.m. on May 18, 2010, approximately ten officers, including several U.S. Marshals, went to the apartment to make contact with the Defendant. Officer Pickard said that, after surrounding the building to ensure the Defendant did not escape, officers began knocking on the door and windows of the apartment. After approximately thirty minutes, the Defendant's uncle, James Pickett, answered the door and told the police that the Defendant was in "a back bedroom area." The Defendant's hat and wig were lying near the couch where Mr. Pickett indicated the Defendant slept.

On cross-examination, Officer Pickard testified that, after Investigator Tate requested help from the fugitive unit in locating the Defendant for questioning, he learned that the Defendant had outstanding warrants. Officer Pickard agreed that, when a suspect is wanted for questioning, the police can not force the suspect to go to the police service center without a warrant. He stated that the Defendant was arrested on May 18, 2010, on matters unrelated to the homicide investigation.

Adam Emory, a Chattanooga Police Department detective, testified that he was present at the police service center on May 18, 2010, in the conference room where the Defendant was brought after his interview. Detective Emory said that he noticed a wig and a hat sitting on the table near the Defendant. Because it appeared to be "some type of disguise," he instructed his trainee, Investigator Puglise, that "crime scene" needed to be contacted to collect the wig and hat for evidence. The Defendant responded that he had purchased the items to disguise himself and successfully worn the hat and wig to remain undetected in the presence of police officers. On cross-examination, Detective Emory agreed

-8-

that the Defendant had been arrested on May 18, 2010, for outstanding warrants unrelated to this case.

Matthew Puglise, a Chattanooga Police Department detective, testified that he came into contact with the Defendant at the police service center on May 18, 2010. He explained that he was in training at the time and that he and Detective Emory walked into the conference room where the Defendant was seated at a table. Detective Emory pointed out the Defendant's hat and wig and referenced it as "a disguise." The Defendant responded that he had worn the items to avoid the police and that he had seen police officers while wearing the items. Detective Puglise said that the Defendant "chuckl[ed]" as he told the officers about being undetected by the police while wearing the hat and wig.

Nathan Bruce testified that he is responsible for the inmate telephone calls at the Hamilton County jail. Mr. Bruce stated that he provided a recording of a telephone call, made around the time of the Defendant's arrest, between the Defendant and Ms. Greer. The following portion of the recording was played for the jury:

[The Defendant]: Man, they got - - I'm down here.

[Ms. Greer]: Man, (Unintelligible) what the f**k to do.

[The Defendant]: Man, go get that money and go give it to that lawyer (Unintelligible).

[Ms. Greer]: You just got there?

[The Defendant]: Yeah, I just got to the County.

[Ms. Greer]: Where you been? Where I was?

[The Defendant]: Yeah.

[Ms. Greer]: Oh, my God.

[The Defendant]: I told you last time I talked to you it might be my last time talking to you. I been - - I told you I been looking at - - I been watching him the whole time I've been looking at their cars and don't have anything to worry about. That s**t crazy. Where you at?

[Ms. Greer]: At home.

[The Defendant]: You okay? (Unintelligible) go get that money and bring it down there to that lawyer. Okay? And see he got going on.

[Ms. Greer]: Okay.

[The Defendant]: That s**t crazy. It's f**ked up.

[Ms. Greer]: They ain't beat you up or nothing, did they?

[The Defendant]: No, no, no, no, no, no. No.

[Ms. Greer]: What the f**k you (Unintelligible)?

[The Defendant]: I (Unintelligible) about six o'clock this morning I'm looking, I'm looking out the door. I see the (Unintelligible) and they seen - - I seen that s**t before that s**t even happened.

[Ms. Greer]: (Unintelligible).

[The Defendant]: They was in there asleep. Talking all that bull s**t like he was, [ ], you got (Unintelligible) as a motherf***er.

[Ms. Greer]: (Unintelligible).

[The Defendant]: I'm going to tell you, guess how they found me, though.

[Ms. Greer]: What?

[The Defendant]: Because that stupid a** fool kept going over my mama house.

[Ms. Greer]: Awww.

[The Defendant]: Yeah. Stupid a** motherf***er, you know they're going to follow your dumb a**. But like I said though I've been watching them the whole time. I've been watching

-10-

them for two days straight.  I seen how they parked in the lady's driveway and all type of s\*\*t.  I'm looking, I'm saying to myself, I seen the s\*\*t.  I seen the s\*\*t before - - I seen the s\*\*t before the s\*\*t even happened.  I was - - I started to leave yesterday but I didn't.

[Ms. Greer]:        What the f\*\*k I'm going do.  I can't go back over my mama's house.  It's like (Unintelligible) there.

[The Defendant]:    That's f\*\*ked up.

[Ms. Greer]:        I ain't got nowhere to put them.

[The Defendant]:    This is all f\*\*ked - -

[Ms. Greer]:        I ain't trying to give my dog away.  I got to (Unintelligible).

[The Defendant]:    Man, that's f\*\*ked up.  You ain't had a chance to try to call (Unintelligible)?

[Ms. Greer]:        I ain't got - - I been calling that phone all morning.

[The Defendant]:    Talking about my uncle now?

[Ms. Greer]:        (Unintelligible).

[The Defendant]:    I (Unintelligible) that motherf\*\*\*er off.  I turned it off where it wouldn't ring.  Call the number 704-0380.  That s\*\*t f\*\*ked - - that s\*\*t there crazy as h\*\*l.  I seen that s\*\*t, Baby.  I started to leave yesterday, I started to leave.  I f\*\*k it, you know what I mean.  I need to get this s\*\*t over with.

[Ms. Greer]:        (Unintelligible) said on (Unintelligible) they saw that picture on TV again yesterday.

[The Defendant]:    They did.  At the 12 o'clock news.  But they didn't show it at the 6 o'clock or 11 o'clock news.  I mean, they ain't show it then.

-11-

[Ms. Greer]:     (Unintelligible).

[The Defendant]:   This s**t here crazy.

[Ms. Greer]:     Yeah.

[The Defendant]:   Uhhh.  (Unintelligible) I mean, try to put some minutes on your phone see if I can talk to you or whatever.

[Ms. Greer]:     (Unintelligible) I was going to see you up there with some red on.

[The Defendant]:   Uh-huh.  They ain't charged me yet.

[Ms. Greer]:     They can't.

[The Defendant]:   Only thing they charged me with is they just charged me with probation violation and all that s**t.  That's why I need that lawyer to go on and I mean how they - -

[Ms. Greer]:     (Unintelligible).

[The Defendant]:   (Unintelligible) No, I wait until you get the minutes on your phone try to do all that.

[Ms. Greer]:     Well, I'm going to get this money, I need to get (Unintelligible).  (Unintelligible).

[The Defendant]:   About 250.  I don't know.  Probably 150 or 250.  It's one of them.

[Ms. Greer]:     A used one?

[The Defendant]:   No, a used one probably cost 125, somewhere like that.

[Ms. Greer]:     Because I mean I got to move.  (Unintelligible) and I walk down (Unintelligible).

[The Defendant]:   Man, I even tried to call him, send the police somewhere else.  I had even called the police line and told them.  I

-12-

was like, man, send the police to the Woodlawns because I see [the Defendant] out here. And them folks wasn't going for that s**t.

[Ms. Greer]:          (Unintelligible).

[The Defendant]:    You know, they just started knocking on that door even harder. That n***** said (Unintelligible).

Shameka Greer, the Defendant's girlfriend, testified on his behalf. She stated that she and the Defendant lived together. She said that the Defendant had eight children ranging from one to seven years of age. She said that none of the children lived with the Defendant full-time but that two of the children lived with them "most of the time." Ms. Greer stated that the children all played together when they were at the Defendant's house together. She described their play as "rough."

Ms. Greer testified that the victim came to the house less frequently than the other children. She said that "up until this situation" the victim would stay no longer than a day or two. Ms. Greer recalled that the victim came over for Easter and then stayed because the victim's mother was moving and asked she and the Defendant to keep the victim until her move was complete. She stated that the victim's mother only called two times during his stay to check on him.

Ms. Greer testified that she had never seen the Defendant hurt or injure the victim. She stated that she and the Defendant were working with the victim on potty training but that she never saw the Defendant became angry with the victim during the potty training process. Ms. Greer agreed that she had seen the Defendant bite the victim but that the bite was in a "playful way." Adults in the house during this time other than the Defendant and Ms. Greer were the Defendant's sister, Colandra Tumlin, and the Defendant's cousin, "Bruce." Ms. Greer denied that there was ever a time that she felt the victim needed to go to the hospital and the Defendant did not want to take the victim to the hospital.

Ms. Greer testified that on Thursday, April 29, 2010, "the children" went home, leaving the Defendant, Ms. Greer, and the victim. On the morning of April 30, 2010, Ms. Tumlin brought her children, ages six and four, to their house to stay for the day. Ms. Greer stated that both the Defendant and Ms. Tumlin were "in and out all day" while she remained at the residence with the children. At 5:45 p.m., Ms. Tumlin drove Ms. Greer to work at Church's Chicken, and Ms. Greer worked until close at 12:00 a.m. Ms. Greer stated that, when she left to go to work, the victim was "fine." When she returned home at around 1:00 a.m., the victim was lying on the bed. She recalled that he greeted her and appeared "fine."

After changing her clothes she went into the living room with the Defendant where she smoked a cigarette, and they discussed her day. At some point, they heard a noise, turned down the television, and called the victim. He responded, so they assumed he was alright. Later, he "moaned" again. This time, Ms. Greer went to check on him and brought him back out to the living room. She sat him down with the Defendant and went to get the victim some water. The victim told them that his stomach hurt, so the Defendant warmed some rice. The victim took the first bite slowly but did not chew on the second bite, so Ms. Greer retrieved the rice from his mouth with her finger to prevent him from choking.

Ms. Greer testified that she and the Defendant were both confused about the victim's state because he had "been fine all day." She called Ms. Tumlin to ask for use of her car to drive the victim to the hospital. She said that the victim was still breathing at this time but that his breaths were not "strong," and she described the victim as "weak." Ms. Tumlin came to the house, and then Ms. Greer drove Ms. Tumlin back home before taking the victim to the hospital where she "begged for help." She stated that the victim was breathing at the hospital. Ms. Greer stated that she did not see any injuries on the victim before she took him to the hospital other than "his bite mark" and a burn mark where the victim "bumped on the heater." Ms. Greer explained about how the victim received the burn. She said that she bathed the victim because he had wet himself. As she dried him off, she noticed he was cold and turned on the space heater. Later that day she noticed the blistering on the back of his leg.

Ms. Greer testified that, on more than one occasion during the victim's stay with them, the victim complained about his stomach. She said that feeding the victim had always remedied his complaint. She maintained that she did not notice anything unusual about the victim either before or after she returned from work on the night he died.

On cross-examination, Ms. Greer agreed that she and the Defendant were the victim's sole care givers from April 4, 2010, until his death on May 1, 2010. Ms. Greer confirmed that the victim was standing in front of the heater when he was burned. Ms. Greer denied ever stating that when she gave the victim water he spit it out. When provided with the transcript of her earlier testimony, she said that her first statement was incorrect, and she maintained that the victim did not spit out the water she gave him after she returned home from work. Ms. Greer agreed that initially she lied to the police telling them that the Defendant had been "out" on the night she took the victim to the hospital. After the police spoke with Ms. Tumlin, they questioned her again, and she admitted that the Defendant was home all night with the victim. Ms. Greer stated that the Defendant was scared to go to the hospital because of his "prior warrants."

Ms. Greer testified that the victim did not have all of the injuries shown in the pictures

taken at the hospital before she took the victim to the hospital. She acknowledged that some of the bruising had been present from "playing, hitting hisself." She stated that some of the bruising "could have came from [the victim's] mom's house" and maintained that not all of the bruising depicted in the photographs "happen[ed] at [her] home." Ms. Greer agreed that she was aware of the bite marks explaining, "Dad bites. I got bite marks on me." Ms. Greer stated that the next time she spoke with the Defendant after the victim was pronounced dead at the hospital was a telephone call from jail on the day of his arrest.

On redirect examination, Ms. Greer testified that the Defendant had been wearing a wig and a hat for some time.

Colandra Tumlin, the Defendant's sister, testified that on April 30, 2010, she and her children, ages eight and six, were at the Defendant's house. She recalled that the children all played together "running back and forth, playing, falling off bikes." She said she did not notice any abnormal behavior from the victim on that day. Ms. Tumlin stated that she took Ms. Greer to work "after 5:30." Later that night she received a call from Ms. Greer, and she drove to the Defendant's house. Ms. Tumlin left her friend, Kiesha, in the car and went inside and found the Defendant holding the victim. The Defendant told Ms. Tumlin to "listen," and she noticed the victim's breathing was not normal. She told the Defendant he needed to take the victim to the hospital. Ms. Tumlin said that Ms. Greer and the victim drove her home and then proceeded to the hospital. Later, a "lady" called Ms. Tumlin and told her that the victim had "passed."

On cross-examination, Ms. Tumlin testified that, after taking Ms. Greer to work, she took pizza to the Defendant's residence for her children and the victim. She said that the victim ate two pieces of pizza. Ms. Tumlin reiterated that the victim was "fine." She said that the victim had been constipated at times during his stay with the Defendant but that she was unaware of any other "traumatic happening" during his stay.

Ms. Tumlin agreed that Ms. Greer called her at around 2:45 a.m. and that she and her friend Kiesha went to the Defendant's home. She stated that, despite the victim's abnormal breathing and her advice to the Defendant to take the victim to the hospital, she "didn't think it was anything serious."

The Defendant testified that he had prior felony criminal convictions for: possession of drugs, vehicular homicide, aggravated assault, possession of cocaine for resale, a drug-related offense, carrying contraband into a penal institution, and aggravated burglary. The Defendant said that prior to Easter 2010, he was aware of pending warrants for his arrest. He obtained a wig and ball cap in November 2009, to avoid arrest on those warrants.

The Defendant testified that he had eight children: twin seven-year-old boys, a six-year-old, the victim, two four-year-old girls, and twin one-year-old girls. The Defendant stated his twin seven-year-old boys and his six-year-old daughter were also living with him during the month of April 2010. He said that these children returned to their mother on April 29 and 30, 2010, while the victim remained with him. During their stay with the Defendant, all of the siblings played together. He described their play as "rough play" including wrestling, biting, and jumping off a bed on to one another. He stated that his children also played on bicycles and children's motorized vehicles.

The Defendant testified that the victim initially came to stay with him at his request. He had purchased an Easter outfit for the victim and wanted to include him in the family holiday activities. After Easter, he kept the victim at his home because he wanted the victim to spend time with his siblings because "[the victim] d[id]n't come around as often as the rest of them do." At some point he called the victim's mother to notify her that he would be bringing the victim back to her. She asked the Defendant if he would continue to keep the victim because she had "a problem, a situation," and the Defendant agreed. The Defendant stated that the victim's mother called to check on the victim only two times during the course of his stay. During one of the conversations, the Defendant asked the victim's mother how he requested food, and she said that the victim would say, "eat-eat." The Defendant told the victim's mother that the victim did not use that terminology with him but rather would point to his stomach and indicate that "it" hurt. He said that the victim was not talkative and kept to himself.

The Defendant testified that the victim experienced constipation when he first arrived at the Defendant's residence. He said that when this occurred he sat with the victim and rubbed his back or stomach. The Defendant agreed that he worked on potty training with the victim and denied that he ever grew frustrated or upset over the victim's progress. He stated that he had potty-trained his older children as well.

The Defendant testified about the night of April 30, 2010. He recalled that Ms. Greer left for work shortly before 6:00 p.m. and a friend, Cornel Watkins, came over and watched a quarter of a basketball game. He said that Ms. Greer arrived home around 1:15 a.m. The victim had been in bed about an hour, but the Defendant heard the victim greet Ms. Greer. After a while, Ms. Greer came into the living room area, and the two watched television together. At some point, the victim made a noise, and they called out to him and the victim responded. They continued watching television and approximately thirty minutes later, the victim made a noise again. This time Ms. Greer went to check on the victim, gave him some water, and brought him out to the living room. The Defendant heated some rice, and the victim took a bite and then would not chew the second bite. The Defendant said he noticed that the victim was "breathing funny," and he and Ms. Greer decided the victim needed

medical attention. Ms. Greer called Ms. Tumlin to ask for use of her car. The Defendant explained that their car "was down at that time." Ms. Tumlin drove to the Defendant's residence and also listened to the victim's breathing. The Defendant recalled that Ms. Tumlin agreed that they should take the victim to the hospital, so Ms. Greer and the victim drove Ms. Tumlin home and then proceeded to the hospital.

The Defendant testified that he did not take the victim to the hospital himself because he was aware of the outstanding warrants for his arrest and wanted to avoid apprehension. He said that night he saw "cops around," so he went to his "children's mother's house." It was while there that he learned from his sister of the victim's death. The Defendant denied that he had been avoiding the police because of the victim's injuries, maintaining that he was solely concerned about the outstanding warrants. He stated that he wanted to speak with police about the victim's death but could not do so because of the outstanding arrest warrants. The Defendant said that in the taped telephone conversation between he and Ms. Greer, he told Ms. Greer that he was "glad this over with," meaning the arrest for the unrelated charges, because now he could speak with the police about the victim.

The Defendant testified about his statements to Detective Tate on May 18, 2010. He agreed that he told Detective Tate that he had bitten the victim. He disagreed with Detective Tate's interpretation of how he demonstrated hitting his children. He explained that when his children would run "up on" him, he would brush them away, not hit them. The Defendant denied ever hitting or striking the victim in the abdomen. He said that the bruising on the victim was from normal child's play. When asked if he killed his son, the Defendant replied, "No, sir. I love my son, why would I kill him."

On cross-examination, the Defendant testified that he and Ms. Greer lived at three different locations between November 2009 and April 2010. He agreed that Ms. Greer worked at Church's Chicken but denied that she was "the provider" explaining that he "sold drugs." He agreed that he also sporadically worked for Ms. Greer's family who had a subcontract with United Van Line.

The Defendant reiterated that his children played "extremely rough." When asked what he would do to stop the children from hurting one another, he said that he would tell them to stop if one of the children alerted him. The Defendant said that, when his children would come to him crying from an injury, he would "[d]ust them off and [tell them to] go on back and play." The Defendant denied that the victim was having difficulty with potty training, explaining that the victim's mother was not making any effort to teach him. He said that he worked on potty training the victim and made some progress. The Defendant stated that the victim dressed himself and bathed himself. He said that he ran the water for the bath and laid out his clothes, but his children bathed themselves. He said that sometimes his other

children would also help the victim dress.

The Defendant viewed the photographs taken of the victim at the hospital. He said that he had never seen the injuries depicted in the photographs. About the bite marks on the victim the Defendant stated, "some of them bite marks old that I done probably bit my son a time or two." He denied that the marks on the victim's shoulder were a bite mark but offered no explanation for the injury, other than speculation that one of his children could have later hit the same area he bit causing the area to appear "like more than what it is." He denied beating or hitting the victim. About the bruising seen on the victim in the photographs, the Defendant said the bruising would have been darker had the bruises been the result of abuse rather than play. The Defendant stated that the victim "bruise[d] real easily." The Defendant agreed that the burn mark on the back of the victim's leg "look[ed] serious." He stated that he did not take the victim to the doctor for the burn because it did not look "serious" at the time it happened. He said Ms. Greer put ointment on the burn and bandaged it.

The Defendant testified that "two or three" of the "round marks" on the victim's body were bite marks but stated that he did not know what the other marks were. As to the totality of bruising, "circular marks," and scratches depicted in the photographs, the Defendant suggested that the victim may have fallen on gravel while running away from "the dog," and playing in the bushes. When asked about a photograph depicting what appeared to be a cigarette burn on the victim, the Defendant said he had "no idea" what the injury was and denied that it was a cigarette burn. He suggested that perhaps it occurred when the victim was outside and fell on "something." The Defendant agreed that both he and Ms. Greer smoked in their home.

The Defendant testified about the events leading up to the victim going to the hospital. He agreed that the victim made noises he had never made before, that he choked on water, that Ms. Greer had to remove uneaten food from the victim's mouth, and that he was breathing "funny," but the Defendant maintained that he was concerned but not worried. He said that many of his children have asthma, so he believed the victim "probably need[ed] a breathing treatment." The Defendant agreed that the victim never responded to him as the Defendant held him asking, "What's wrong daddy-man?"

The Defendant testified that he "didn't live nowhere" after he left the residence the night the victim went to the hospital. He elaborated that he "probably spending the night places," but "didn't live nowhere." He stated that Ms. Greer remained at their residence on 10th Avenue. The Defendant agreed that the wig and hat shown in court were his wig and hat used as a disguise. He said that he used it because the police knew he had a "low haircut."

-18-

Based on this evidence, the jury convicted the Defendant of two counts of child abuse, one count of criminally negligent homicide, and one count of aggravated child neglect. The trial court sentenced the Defendant to two twelve-year sentences for the child abuse convictions, a six-year sentence for the criminally negligent homicide conviction, and a sixty-year sentence for his aggravated child neglect conviction. The trial court ordered these sentences to be served concurrently for a total effective sentence of sixty years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts on appeal that: (1) the trial court erred when it failed to compel the State to make an election of offenses; (2) the trial court failed to instruct the jury that reckless endangerment and attempted aggravated child neglect are lesser-included offenses of aggravated child neglect; (3) the evidence is insufficient; (4) the trial court improperly admitted medical testimony about the victim's injuries; (5) the State engaged in prosecutorial misconduct; (6) the trial court improperly instructed the jury on flight; and (7) the cumulative effect of these errors deprived the Defendant of a fair trial.

### A. Election of Offenses

The Defendant argues that the trial court erred in denying his motion to compel the State to make an election of acts underlying the indictment for aggravated child neglect and child abuse. The Defendant contends that the trial court's error permitted the jury to deliberate on different facts and thus created the potential for a non-unanimous verdict on that count. The State responds that the State was not required to elect which injury and time frame formed the basis of his child abuse and aggravated child neglect crimes.

The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed more offenses against a victim than those charged, the State must elect the facts upon which it is relying to establish each charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). Thus, when the State charges a single offense but presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999); *see also State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Defendant's right to a unanimous jury verdict on each and every count is "fundamental, immediately touching the constitutional rights of the accused." *State v. Burlison*, 501 S.W.2d 801, 804 (Tenn. 1973).

Our Supreme Court has held that aggravated child neglect is a continuing course of conduct "beginning with the first act or omission that causes adverse effects to a child's health or welfare." *State v. Adams*, 24 S.W.3d 289, 296 (Tenn. 2000). The crime "continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect." *Id*. The Court reasoned:

> Indeed, it would be an absurd construction to hold that criminal child neglect is complete as soon as the child's health and welfare are first adversely affected, especially when the child remains in this condition for a substantial period of time. Neglect simply does not lend itself to division into segments of discrete acts each having various points of termination. Rather, a more reasonable construction of the offense supports the view that the offense continues until the person responsible for the neglect takes reasonable steps to remedy the adverse effects to the child's health and welfare caused by the neglect.

*Id.* at 294-96 (internal citations omitted).

The indictment in this case alleged that on May 1, 2010, the Defendant neglected the three-year-old victim, resulting in the victim's death. The evidence at trial showed that the victim was in the Defendant's custody from April 4, 2010, until his death. The night of the victim's death, the Defendant was home alone with the victim. The Defendant testified that he did not take the victim to the hospital for fear he might be arrested for outstanding warrants. By the time Ms. Greer took the victim to the hospital, on May 1, 2010, for medical treatment, the victim was dead. During closing argument the prosecutor told the jury that the evidence supporting the allegation of aggravated child abuse was the bruising, the injuries to the victim's head, and the bite marks. As to the aggravated child neglect charge, the prosecutor directed the jury to the doctor's testimony about the obvious signs and symptoms attendant to the victim's perforated bowel and, despite those signs, the Defendant's failure to seek medical attention.

In our view, the indictment clearly identifies the incidents for which the Defendant was charged and convicted. The proof at trial did show multiple injuries to the victim, however, the State identified and directed the jury to consider specific injuries as the basis for the Defendant's aggravated child abuse charge and a separate injury and specific conduct as to the Defendant's aggravated child neglect charge. Based upon the indictment and the State's closing argument, the Defendant's right to a unanimous jury verdict was not violated.

Furthermore, the trial court charged the jury with respect to child neglect:

Neglect is a continuing course of conduct beginning with the first act of omission that causes adverse affects [sic] to a child's health and welfare and can be an act of commission or omission.

The trial court's instruction to the jury was proper and appropriately limited the facts upon which the jury could render its verdict on aggravated child neglect.

Based on the foregoing authorities, the trial court correctly ruled that the State was not required to make an election on the offenses of aggravated child neglect and aggravated child abuse, the trial court properly instructed the jury. The Defendant is not entitled to relief on this issue.

## B. Lesser-Included Offenses of Aggravated Child Neglect

The Defendant asserts that the trial court failed to instruct the jury that reckless endangerment and attempted child neglect were lesser-included offenses of aggravated child neglect. The State responds that the Defendant has waived our review of this issue for failure to either request the instruction or raise an objection with the trial court. As such, the State contends that there is no plain error because the instruction for reckless endangerment and attempted child neglect were not supported by the evidence at trial or legally required.

In Tennessee, "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal." T.C.A. 40-18-110©); *See also State v. Page*, 184 S.W.3d 223, 229-30 (Tenn. 2006). This court may, however, review an issue which would ordinarily be considered waived if the court finds plain error in the record. *See* T.R.C.P. 52(b). The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *State v. Smiley*, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is *de novo* with no presumption of correctness. *Id*.; *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). A trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); see also Tenn. R. Crim. P. 30(d)(2). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992).

Tennessee Code Annotated section 40-18-110 provides the following test for determining what constitutes a lesser-included offense:

(f) An offense is a lesser-included offense if:

(1)     All of its statutory elements are included within the statutory elements of the offense charged; or

(2)     The offense is facilitation of the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);

(3)     The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or

(4)     The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

T.C.A. § 40-18-110(f). The statute also defines specific crimes as lesser included offenses of other crimes, such as voluntary manslaughter is a lesser included offense of both premeditated first degree murder and second degree murder. *See* T.C.A. § 40-18-110(g).

Whether a lesser-included offense must be charged in a jury instruction necessarily requires a two-step analysis. First, the trial court must determine whether an offense is a lesser-included offense; then, it must determine whether a charge is justified by the evidence. *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001).

**1. Reckless Endangerment**

This Court has previously held that reckless endangerment is a lesser-included offense of aggravated child neglect. *See State v. Kathryn Lee Adler*, No. W2001-00951-CCA-R3-CD, 2002 WL 1482704 (Tenn. Crim. App., at Jackson, Feb. 19, 2002), *perm. app. denied* (Tenn. Sept. 9, 2002). Our analysis, however, does not conclude there. The charge must be justified by the evidence. *Ely*, 48 S.W.3d at 722. This step requires that we determine (1) whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense, and (2) whether the evidence is "legally sufficient" to support a conviction for the lesser-included offense. *Id.* The evidence must

be viewed liberally in a light favoring the existence of the lesser-included offense without making any judgments as to credibility of the evidence. *Burns*, 6 S.W.3d at 469.

Tennessee Code Annotated section 39-13-103(a) provides that "[a] person commits [reckless endangerment] who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Dr. Dubois testified that the victim might have survived had he received immediate medical attention for the perforated bowel. We conclude that reasonable minds could have accepted this lesser-included offense, and the evidence would have been sufficient to sustain such a conviction.

Although we have determined that reckless endangerment is a lesser-included offense of aggravated child neglect, the Defendant waived his right to dispute the trial court's failure to instruct on the lesser-included offense by not filing a request or objecting to the instructions. *See* T.C.A. 40-18-110©). Thus, this Court need not grant relief unless the failure to instruct constituted plain error, or in the alternative, this Court, in the exercise of its discretion, opts to consider the merits of the issue. *See State v. Adkisson*, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1994). Having so concluded, we must now address whether the instructional error was plain error.

The Tennessee Rules of Criminal Procedure explain that "plain error [,] . . . [a]n error which has affected the substantial rights of an accused[,] may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). We have said that "[w]hether or not an appellate court should recognize the error and grant relief . . . depend[s] upon the facts and circumstances of the particular case." *State v. Ogle*, 666 S.W.2d 58, 61 (Tenn. 1984).

In *State v. Smith*, 24 S.W.3d 274 (Tenn. 2000), this Court discussed the recognition of plain error by appellate courts. In *Smith*, we adopted the test established in *Adkisson*, 899 S.W.2d at 641-42, to determine whether a trial error rises to the level of "plain error." *Smith*, 24 S.W.3d at 282-83. *Adkisson* held that the following five factors must be present for a finding of plain error:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

899 S.W.2d at 641-42 (footnotes omitted). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Smith,* 24 S.W.3d at 283.

In the case under submission, it is clear that all five factors have not been established. The Defendant has failed to show that a substantial right has been adversely affected. A trial court's failure to instruct a lesser-included offense is harmless when the jury finds a defendant guilty of the greater offense to the exclusion of the immediately lesser-included offense, which was a greater offense than the one requested. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). The sequential jury instructions charged aggravated child neglect and felony child neglect. The jury found the Defendant guilty of the charged offense of aggravated child neglect to the exclusion of the other charged lesser-included offense. Therefore, the trial court did not commit "plain error" when it failed to instruct the jury on reckless endangerment. The Defendant is not entitled to relief as to this issue.

## 2. Attempted Aggravated Child Neglect

Pursuant to Tennessee Code Annotated section 40-18-110, the attempt to commit the charged offense is a lesser included offense. The Defendant was charged with aggravated child neglect and, therefore, attempted aggravated child neglect is a lesser included offense of the charged offense in this case. We address this issue also under plain review.

We conclude that the Defendant has failed to show that a substantial right has been adversely affect. As we previously noted, the failure to instruct a lesser-included offense is harmless when the jury finds a defendant guilty of the greater offense to the exclusion of the immediately lesser-included offense, which was a greater offense than the one requested. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). The jury found the Defendant guilty of the charged offense of aggravated child neglect to the exclusion of the other charged lesser-included offense. Therefore, the trial court did not commit "plain error" when it failed to instruct the jury on attempted child neglect. The Defendant is not entitled to relief as to this issue.

## C. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his conviction for aggravated child neglect because the bowel perforation was not "immediately evident" to the Defendant or the treating physician in the emergency room. The State responds that the evidence showed that the Defendant caused the victim's fatal injury, knowingly neglected this injury, and that the victim was adversely affected as a result of the injury.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view

of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the evidence supporting his aggravated child neglect conviction. Aggravated child neglect occurs when the accused knowingly treats a child under the age of eighteen so as to adversely affect the child's health and welfare and the act of neglect results in serious bodily injury to the child. T.C.A. § 39-15-401(b) (2010). An accused acts "knowingly" with respect to his or her conduct "when [he or she] is aware of the nature of the conduct." T.C.A. § 39-11-302(b) (2010).

The evidence, considered in the light most favorable to the State, shows that the victim was in the Defendant's care and custody from April 4, 2010, until his death on May 1, 2010. The victim died from bowel perforations due to blunt force abdominal trauma. The medical examiner estimated that the holes in the victim's intestines occurred eight to twelve hours before the victim died and necessitated immediate medical attention. For the majority of the twelve hours leading up to the victim's death, the Defendant was the sole caretaker of the victim while Ms. Greer was at work. According to medical testimony, the victim would have experienced severe pain, vomiting, and fever as a result of these injuries. The Defendant and Ms. Greer both testified to symptoms alerting them to the victim's injuries, and the Defendant failed to act. As a result, the victim died before Ms. Greer got him to the hospital on May 1, 2010. This evidence was sufficient for a jury to find that the Defendant's failure to seek immediate medical treatment for the victim adversely affected the victim's health and welfare.

It appears that the Defendant may also be arguing that the Defendant's conviction for aggravated child neglect should have merged with his conviction for child abuse because the offenses are codified in the same statute. In this case, however, the State did not offer alternative theories. The State proceeded under the theory that the Defendant both inflicted the victim's injuries and also failed to seek medical treatment for the injuries resulting in the victim's death. As we stated above, the evidence is sufficient to support the Defendant's conviction for aggravated child neglect. Our review of the record also supports the finding that the Defendant caused the victim bodily harm.

Accordingly, the Defendant's conviction for aggravated child neglect is supported by the evidence in the record. The Defendant is not entitled to relief.

## D. Evidence of Prior Injuries

The Defendant asserts that the trial court improperly allowed evidence of the victim's prior injuries to be presented at trial and that the trial court improperly allowed Ms. Goodin and Ms. Boles to testify about the victim's injuries. The State responds that the trial court did not abuse its discretion in allowing evidence of the victim's prior injuries or the testimony of the two emergency room nurses that attended the victim.

### 1. Prior Injuries

The Defendant argues that the trial court erred when it denied his pretrial motion to exclude proof related to the victim's "prior injuries," in violation of Tennessee Rule of Evidence 404(b). The State responds that the evidence was properly admitted because it was materially relevant to the Defendant's guilt and its probative value outweighed any danger of unfair prejudice.

Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. When a trial court decides whether to allow evidence to be presented at trial, "the trial court must consider, among other things, the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). "The decision regarding the admissibility of [evidence] pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent, guilty knowledge, identity of the defendant, absence of mistake, a common scheme or completion of the story. *State*

*v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In the present case, the trial court held a hearing outside the jury's presence and then issued a subsequent order determining that testimony regarding the victim's prior injuries was admissible. In its order the trial court divided the injuries into those which implicated 404(b) and those which did not. The trial court first addressed the injuries inflicted contemporaneous with those that caused the victim's death. The trial court first noted the State's duty to prove beyond a reasonable doubt that the Defendant, charged with first degree murder by aggravated child abuse, knowingly, other than by accidental means, inflicted upon the victim serious bodily injury that resulted in his death. It then reasoned:

> All the injuries found on the victim at the time of his death, inflicted contemporaneously with the blunt force trauma that caused his death, are relevant on the issue of causation, no matter who caused these injuries, because they are relevant to prove that the injuries were caused by a person intentionally or knowingly and that they were not caused "by accidental means."

> Because the State must specifically prove cause of death and that the injuries to the three-year-old victim were not caused by accidental means, evidence of those injuries is highly probative on those issues. The probative value of that evidence is not substantially outweighed by the danger of undue prejudice to the [D]efendant, [t]herefore Rule 403 does not exclude that evidence, and the evidence will be admissible in the jury trial.

The trial court then analyzed under Rule 404(b) the bruises, bite marks, and abrasions

found on the victim's body and claimed by the Defendant to have been caused by his "playful" hitting and biting of the victim. The trial court found that the proof that the Defendant caused these injuries was clear and convincing in light of the Defendant's admission and Ms. Greer's substantiation of the admission. Further, it found:

> The evidence of multiple bruises, multiple bite marks, and abrasions on the victim, and the evidence that the Defendant inflicted those bruises, bite marks and abrasions are relevant on the material issues of intent (or "knowing") and absence of mistake.

> The offense of Child Abuse requires proof that the act of abuse was committed <u>knowingly</u> and not by <u>accidental means</u>. Since [the] Defendant claimed that the bruises, bite marks, and abrasion on [the] victim's body were caused by "play" with the child, and were therefore akin to accidents, proof that the Defendant was responsible for those injuries is highly probative of his intent to harm the victim and that the fatal injury to the victim was not accidental.

> Under 404(b), the court must then determine whether the admission of evidence of those injuries would be unfairly prejudicial to the Defendant. The [c]ourt finds, upon weighing the highly probative nature of that evidence against the danger of unfair prejudice, that its probative value outweighs the danger of unfair prejudice. Therefore, this evidence will be admissible in the jury trial.

Finally, the trial court considered under 404(b) evidence of the burn on the back of the victim's leg based upon the Defendant's custody of the victim at the time of the burn. The trial court found that the proof regarding the victim's burn was clear and convincing, stating:

> Evidence of the nature and severity of this burn, and the fact[ ] that it occurred relatively close in time to [the] victim's death and that it occurred while the victim was in the custody of the Defendant, is also relevant on the issues of intent and absence of accident, and is therefore probative on material issues other than that of conforming to a character trait of [the] Defendant.

> Again, the crime with which the Defendant is charged requires the State to prove, beyond a reasonable doubt, that the Defendant inflicted the injuries that caused the victim's death "knowingly" and "other than by accidental means." This evidence is highly probative of [the] Defendant's intent to harm

the victim and that the victim's fatal injury was not caused by accidental means.

We conclude that the evidence of all the victim's injuries found at the time of death are relevant on the issues of cause of death, intent, and absence of mistake. The State's proof regarding the victim's injuries was through medical personnel who recounted the injuries observed and through photographs of the victim's body. Because the State had the burden of proving that the victim's death was not accidental or a result of routine child's play, we conclude that the trial court did not err in finding the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the trial court properly exercised its discretion in admitting evidence of the victim's injuries. The Defendant is not entitled to relief.

## 2. Nurses' Testimony

The Defendant contends that the trial court erred in allowing "Nurse Goodin" to testify that the victim's injuries appeared to her to be inflicted rather than accidental, asserting that this testimony "was prejudicial and invaded the province of the jury." The Defendant also notes that Ms. Boles testified to ongoing abuse as well. The State responds that the trial court properly allowed Ms. Goodin and Ms. Boles to testify that the victim's injuries were consistent with inflicted injury. The State asks us to waive any argument with respect to Ms. Boles because the Defendant failed to file a motion in limine or contemporaneously object to her testimony at trial.

We first note that, as the State points out in its brief, the Defendant neither filed a motion in limine, nor did he raise an objection at trial to Ms. Boles's testimony. Thus, the Defendant has failed to preserve the issue of Ms. Boles testimony for appellate review. *See* Tenn. R. App. P. 36(a). An objection was raised at trial to Ms. Goodin's testimony about the victim's injuries and, thus, we consider the Defendant's issue as it relates to Ms. Goodin's testimony.

Rule 702 of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony of expert witnesses. It states in pertinent part:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy

facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). Questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. *Stevens*, 78 S.W.3d at 832.

Ms. Goodin testified that she received an associate's degree in nursing in 2006 and that she received her bachelor's degree in 2007. She said she worked in the emergency department of the Children's Hospital at Erlanger. In this role, she had the opportunity to observe children who had been injured in a variety of types of accidents and children who had been injured intentionally. In addition, Ms. Boles, a pediatric emergency room nurse, and Dr. Dubois, a pediatric emergency room physician, observed the victim's injuries on May 1, 2010, and also concluded, based upon their experience, that the injuries were consistent with inflicted injuries. The record reflects Ms. Goodin's opinion was based on her personal observations, specialized knowledge, and experience as a pediatric emergency room nurse.

The Defendant cites to multiple cases involving sexual abuse where expert opinions that attack a victim's credibility or describe a victim's behaviors are inadmissible. We find these cases inapplicable to the issue at hand. Ms. Goodin, a trained pediatric emergency room nurse, testified about her medical observations of the victim's visible injuries in comparison to other injured patients treated in the pediatric emergency room.

The record reflects that Ms. Goodin was qualified to testify as an expert witness in child abuse and her opinion substantially assisted the jury in understanding the emergency room assessment of the victim's injuries. Therefore, her opinion that the victim's injuries were consistent with inflicted injuries was permissible pursuant to Rule 702. *See State v. Frederick Leon Tucker*, No. M2005-00839-CCA-R3-CD, Davidson County, slip op. at 8 (Tenn. Crim. App., at Nashville, Mar. 7, 2006) (concluding a nurse practitioner from Our Kids Center was qualified to testify as an expert witness); *State v. Frankie Ledbetter*, No. M2002-02125-CCA-R3-CD, Marion County, slip op. at 14-15 (Tenn. Crim. App., at Nashville, Aug. 7, 2003) (concluding a physician's assistant was qualified as an expert). The Defendant is not entitled to relief as to this issue.

### E. Prosecutorial Misconduct

-31-

The Defendant contends that the prosecutor engaged in misconduct during closing arguments and attempted to influence an eyewitness. The State responds that the Defendant has failed to prove that these alleged acts of misconduct prejudiced him or amounted to reversible error.

When a reviewing court finds improper argument or conduct, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case ." *See State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003) (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

### 1. Closing Argument

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See Goltz*, 111 S.W.3d at 5 (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

In *Goltz*, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn.

-32-

Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code Of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See [State v.] Cauthern*, 967 S.W.2d [726,] 737 (Tenn. 1998); *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6 (quoting Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)). A criminal conviction, however, should not be lightly overturned solely on the basis of the prosecutor's closing argument. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13, (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal).

The Defendant specifically attacks the following statements made during closing argument:

> [The Defendant] looks at you directly in the eyes and he tells you, well, I'd seek medical attention for my son for something serious. Well, I ask you when does it become serious? When have you seen your child to such a degree that you have to take them to the hospital. When? The timeline isn't important.
>
> . . . .
>
> That boy looked at you and expected you to treat him and love him and raise him and look what you did to him. . .

In closing argument, the defense attacked the State's time frame of the events.

Further, the defense stated that the victim's complaints were familiar and thus did not alert the Defendant to the need for medical care. A point of consideration in our review is whether an argument is made in response to a defendant's comment or argument. Rebuttal argument is limited to the subject matter covered in the State's opening argument and the defendant's intervening argument. Tenn. R. Crim. P. 29.1(b). The prosecutor's statement regarding when one seeks medical attention was made during the State's second closing and in response to the Defendant's closing. We conclude that as such, the prosecutor's statement was a proper response to the Defendant's closing argument attacking the validity of the State's theory of the time frame of the events leading up to the victim's death.

The second statement was also made during the State's second closing argument and appears to have been directed at the Defendant. As such, we find this comment improper. We cannot, however, conclude that the comment affected the verdict. The reference to the Defendant was isolated in the context of the entire closing argument, and the State's case against the Defendant was strong. Additionally, the jury was instructed that arguments of counsel are not to be considered evidence. The jury is presumed to follow the instructions of the trial court. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Based upon the strength of the evidence at trial, we cannot conclude that the prosecutor's statement to the Defendant affected the jury's verdict.

## 2. Interaction with Ms. Greer

The Defendant contends that he suffered prejudice when the trial court denied his request to play a recorded voice mail message from the prosecutor for Ms. Greer. He claims the message was a threat made to influence Ms. Greer to testify against the Defendant. The State responds that the trial court correctly found that the prosecutor did not intend to threaten Ms. Greer and, therefore, properly denied the Defendant's request to play the audio recording.

The voice mail message at issue was as follows:

> Hello, this message is for Shameka Greer. This is Charles Minor with the District Attorney's Office. I'd like to talk to you about Reginald Tumlin. My phone number is 423 (Inaudible). I'd appreciate you calling and talk to me. I think it's probably in your best interest to talk to me. Who do you think they're going to blame for this. So again give me a call 209-7426.

After listening to the voice mail message recording and the Defendant's offer of proof, the trial court found the message was not a threat and not relevant. Therefore, in denying the Defendant's request to play the recording for the jury was denied.

-34-

The Defendant has failed to show that the State's conduct was improper or affected the outcome of the trial. The prosecutor sought to speak with Ms. Greer, a witness, before trial. Nothing in the message indicates an intent to cause Ms. Greer to do anything other than return his phone call. The prosecutor is entitled to attempt to make contact with witnesses to discuss the case. It was not improper nor was the prosecutor's attempt to speak with a witness relevant to charges against the Defendant at trial. The Defendant is not entitled to relief as to this issue.

## F. Flight

The Defendant contends that the trial court erred in admitting into evidence the recorded telephone conversation between he and Ms. Greer as evidence of flight and issuing a jury instruction on flight. The State responds that the facts of the case supported a jury instruction on flight.

We first note that the Defendant's argument in his brief focuses on the flight instruction and not the admission of the audio recording. He makes no argument, other than mentioning the admission, and cites to no authority in support of this issue. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b)("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We deem the Defendant's challenge to the admission of the recording waived due to the Defendant's failure to cite to any legal authorities.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). "Nothing short of a 'clear and distinct exposition of the law' satisfies a defendant's constitutional right to trial by jury." *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868))). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531, 544 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998).

The trial court provided the jury with the pattern flight jury instruction:

> Flight. The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntarily [sic] withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving the community for parts unknown to constitute flight. If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the

-36-

defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of both a leaving the scene of the crime and subsequently hiding in the community. *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998). The State may satisfy the subsequent hiding requirement by presenting proof from which a jury might infer that the defendant committed this act. *State v. Terrance Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at \*4 (Tenn. Crim. App., at Jackson, Nov. 22, 1999), *no Tenn. R. App. P. 11 application filed.*.

We conclude that the trial court properly instructed the jury as to the flight. The Defendant contends that because the jury instruction states "The flight of a person accused" and he was not charged at the time, the instruction was improper. We think this too narrow an interpretation of the pattern jury instruction. The proper inquiry, as we stated above, is whether there was sufficient evidence presented to the jury to support the instruction. *Berry*, 141 S.W.3d at 588. The evidence at trial showed that the Defendant left his residence on the night the victim was taken to the hospital. The Defendant remained undetected for over two weeks, residing at various locations and employing a disguise. The Defendant noted to the police upon his arrest that he had successfully used the disguise to remain undetected while in the presence of the police. This is sufficient evidence that the Defendant left the scene of the crime and hid to avoid being arrested for this crime. Accordingly, the trial court did not err in instructing the jury on flight. The Defendant is not entitled to relief as to this issue

## G. Cumulative Error

Lastly, the Defendant contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the Defendant's issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE